Your Honors, I am Christopher Johns. I represent the defendant appellant Eric David Lopez. For your order, I'll be addressing the first issue and the fifth issue. The first issue being the admission of expert testimony regarding cell site location information on rebuttal. Now, without the benefit of expert testimony, the cell site location information is essentially meaningless. We've sent in a 28-J letter citing the recent United States Supreme Court decision of Carpenter v. United States that was decided earlier this year in June. And Carpenter was cited for the proposition with regard to the Fourth Amendment. It requires a search warrant. You can't obtain it through the Stored Communication Act by an order of the court. So the court was concerned about the Fourth Amendment protections. The reason Carpenter is important is because there's an extensive discussion by Chief Justice Roberts on the import of cell site location information. There was, however, a warrant in this case for the information, was there not? In our case? Yeah. Yes, Your Honor, there was. There was a warrant. So the real issue is understanding what does this information mean? Correct, Your Honor. At one point the government argues that had there been no evidence introduced on rebuttal, the jury still could have reverse-engineered this information. I think the record is difficult to get my arms around what came in in the case in chief and what came in in rebuttal. Let me answer that, Your Honor. What came in in the case in chief was simply an expert custodian type who came and said, these are the records. So right there, I'm familiar with that. Can you tell me exactly which exhibit numbers that came in on direct? That's in our excerpt of record 726, I believe, Your Honor, the joint excerpt of record. If you go to exhibit 726, there's a whole conundrum of that data that came in. I have exhibit 2308. Is that where I should be looking? I think that you might want to be going to exhibit JER 726. 726, all right. Thank you. But what was important here is what was the state of the record at the time that this rebuttal came in? That's my question. So maybe we should go to that. You know, the judge said there was a Rule 16 violation. It was on the government. They didn't timely designate an expert. It shouldn't be coming in. That's not contested. Okay, so but what happened here was the records had been authenticated and the judge said, this is what you know. The instructions to the jury. There's no testimony and there may never be any testimony how far away the cell tower may carry traffic. He says, all you really know is it's within what's called radio range. And then the judge cautions, I don't want you to leap to any conclusions that it's the telephone was right next to store to some cell site tower or there was 10 miles away. So the radio range is somewhat amorphous. I mean it could be right next door 10 miles away. It's somewhere in that range. And but I want to point out something in the government's brief at page 81 of the government's answering brief. The in an urban area. That's what they submitted to this court in their in their brief. Was that in the record? Yes, Your Honor. That's a JE 3229. Was there evidence in the trial about identifying radio range? Yes, Your Honor, but here's the problem. It came in in rebuttal. It came in with Nikki Scoverin's testimony in rebuttal. It was not in there. Counselor, that's why I'm trying to get you to focus on what was in the case-in-chief. All that was in the case-in-chief were the cell site records, Your Honor. They had some maps and they had identified some cell locations. That's all that was in the record. And it was the expert witness Nikki Scoverin that tied everything together and was able then to make the connections between the Estrada homicide and the NG and the Joldik shootings. The one on there on July 11th. That's what the import of that was. Was there ever a limiting instruction requested to try to cabin this testimony? There was an effort for a limiting instruction and I'll get to that. Attorney Phillips Bourne for Cruz Ramirez. The court entered an order and what the court said in its order was the door has been opened as to Herrera and Lopez but nobody else. So the lawyer representing Cruz Ramirez, when they started, before Nikki Scoverin's testimony came in, stood up and said, Judge, I want to address this. He said, Counsel, he raised the issue that the testimony would involve inferences that could be drawn to the other defendants. He raised that. And the court cut him off and was very emphatic, stated as follows, quote, I am not going to get back into it. I made my ruling. You objected. I will deem you all as objected. There was a statement in the prosecutor's closing argument that Guevara's cell phone was, quote, within blocks of the attack. Not within blocks of a cell and certainly not, not within blocks of a cell tower and certainly not within radio range. Was there an objection here? There was not an objection there, Your Honor. I believe based on this, the court statement here, it would have been futile. What's important here that this really wasn't rebuttal evidence that was put in, the Nikki Scoverin expert testimony. This is something that should have been put in their affirmative case but they were precluded because of the Rule 16 violation. That was, that was the problem there. And I think, if we're going to think in terms of rebuttal expert testimony, if we go to the Federal Rules of Civil Procedure 26A2C2, which permits the admission of rebuttal export testimony that is, quote, intended solely to contradict or rebut evidence on the same subject matter by an initial expert witness. This wasn't rebuttal evidence. So your argument is that nobody opened the door? Correct, Your Honor. I thought you said Herrera and Lopez opened the door. That's what the judge found, Judge Alsop, and that was contested. Okay, and the basis for that objection was this was simply misidentification evidence. In the government's case in chief, they called Sun Yung Tsang and he was the only eyewitness and his testimony was that it was Carlos Flores that was strikingly the shooter. And when the Defense Council followed up and focused on that, they claimed that that was opening the door, but it was the government put that testimony in. And the same thing with Herrera. Herrera's only testimony was to have some witnesses come in and say, you know, this van that you say that I was a passenger in, it had tinted windows. That's not rebuttal. If I could just make a, running out of time here, a couple of points on the prejudice. There was but there's even more prejudice to the other defendants. Cruz Ramirez, Morris Flores, Guevara, all who objected, all who the judge said it doesn't come in against. And that's the unfairness. And they were able to use Nikki Scovern's testimony to go through then and then try to link Cruz Ramirez and Maurice Flores say, well he was either talking to or close with Lopez at the time of the NG shootings and the Jolik shootings. And they did the same thing with regard to they had agreed they weren't going to put any expert evidence against for the stabbings of Reynoso and the other two people. So that's the prejudice there. I'll move on to the next issue if I could. I did submit, this is the search of Eric Lopez's cellular phone pursuant to a state search warrant. And I did submit a 28-J letter inciting the United States versus artists decision. And I understand the government correctly pointed out that it is now on appeal. Could I ask, as to the search of the cell phone, forgive me for interrupting, but we're but we are running, your time is ticking. So as to the cell phone, I know there were I think a dozen photos that were, was there any other evidence from that phone that you claim was prejudicial? No, Your Honor, because that's the evidence that was put in based on what came in from the cell phone. That's what I'm asking counsel, was there anything else? Okay, so how was there prejudice? Okay, it was prejudice in a number of ways. Number one, we have these photographs that came in. And the photos themselves, the pictures, speaks a thousand words. We're talking about... And they established gang membership, but again to help save time. It seems to me that there was a lot of other testimony about gang membership. So how were these prejudicial, please? Because they had Officer Molina take the stand. And he identified each one of these photographs and he went through it in graphic detail and said, this is how it establishes the MS-13 gang membership. It wasn't just the photos. It was Molina's testimony? Molina's testimony. And he testified in detail to each and every photograph. And then in closing argument, the Assistant U.S. Attorney then argued that testimony and went over again all the photographs and restated and he said, including these are all mementos of the life he had chosen, mementos of his participation in the gang, in the conspiracies that are charged. So this was the cornerstone of their case to establish that Eric Lopez was a member of this MS-13 gang. I realize that was the emphasis because for the obvious reason that the photos have a special significance. But we do have to look at the other evidence that in terms of the witnesses that linked him to the gang membership. I mean your argument would seem to discount that completely. But it seems to me there's a lot of other evidence apart from the photos. So I'd appreciate how you weigh. Well there was other evidence, Your Honor. This had the major impact to establish gang membership. Because there are photographs, there's a quasi expert testimony by a police officer, and there's argument. And we know what the government's emphasis was with regard to these photographs because it's clearly reflected in the detailed argument by AUSA Luang and his conclusions. And he says in the very last line, he concludes, you know, these are the mementos, he's referring to the photographs, of the life he has chosen, mementos of his participation in the gang, in the conspiracies that are charged. So that's the evidence in chief really that they're using for the gang membership. One of the things about the Ortiz decision is the problem with the case is that the officer violated the warrant. I mean there's really no warrant here to search the cell phone. And this is a search of a cell phone now in the digital age. I mean it's been contested. This wasn't an execution warrant, but it was. It was 16 days and the only way that you can get into the cell phone is to open it up and that's exactly what happened. Now there was a contention made by the government that, and the judge found that, well they didn't really download them for a federal purpose or something to that effect. And that's what's been contested. But that's not true because when we go back and we look in the motion to suppress and we see AUSA Lang's declaration and we see Benjamin Horton, the FBI agent's declaration, they tell us that it was downloaded. That's how we have it. When we take the memorandum submitted by the government and the declarations, the 12 photographs were attached to the memorandum that was given to the court in the motion to suppress. Those are the 12 photographs that were attached to the memorandum that was given to the court in the motion to suppress. So that's how we have it. Thank you for interrupting, but could we go back to the cell tower expert, please? Yes. I'm not sure I ever really got an answer and what I'm looking for is, as you know, the government's argued in their brief that from the evidence that was put in in the government's case-in-chief, the jury could have done, the prosecutor could have made the same argument in closing had there been no rebuttal testimony from Agent Skowron. I just would like to get your response to that. My response is this, Your Honor. The judge told the jury before this rebuttal testimony came in, all you know is that it's in radio range and that can be, you know, in and about the cell tower or 10 miles away. That's what the judge said. That was the instruction. So they had, again, in the case-in-chief, right, to the records custodian, they have the exhibits and we've seen them with all of the telephone numbers, right, and they knew where the towers were? Correct. Okay, and could they have matched the date and time of the pings, I'll call them pings, off the towers to those telephone numbers? They had some indicia that these were the cell towers, these were the cell phones. So they just didn't have the distance? They didn't know what radio range was? They did not have distance and that was the critical feature. Okay, but that's their position is that they could have matched the phone number, telephone number, to the tower and know on what date and what time that phone pinged on that tower, is that correct? They do have a time stamp, there's a time stamp, and they do have that to try to link the tower with the phone and the issue is the distance involved. The answer's helpful to me, thank you. If I could just go back, just want to make this one point. With regard to the download of the photos from the cell phone, Benjamin Horton in his declaration, he says that on May 29th, Special Agent Young, who had training and computer equipment, downloaded the contents of the Lopez cell phone. The telephone was later returned to the SFPD. There's no indication here that these photos were given to the SFPD, but AUSA Lang's declaration is even clearer where he says, and he's referring to, because he had to turn these photos over to the defense attorney, who was Mr. Goodman, and he put in his declaration, Goodman, Lopez contents of the telephone that had been made by ICE. ICE located the contents and copied it onto a disk, which the government then sent to Mr. Goodman on or about October 28th, 2010, and then he says that those photos are attached to his declaration. Now this is before the trial, before there's the trial exhibit 27. So very clearly, ICE went to their files based on his declaration and got the photos. So they were downloaded by the federal government. I think I'm out of time. Thank you, counsel. We'll hear from whoever is speaking next. Good morning, your honors. May it please the court, Jamie Lee Moore, representing Angel Noel Guevara, along with my colleague, Mr. Lupe Martinez. I'm here to address the eyewitness identification expert issue. Judges have for a long time been suspicious about identification of strangers. And in 1967 in United States v. Wade, Justice Brennan quoted Justice Frankfurter's comment and observation that the identification of strangers is proverbially untrustworthy. And then in 1981, Justice Brennan went on to point out that to a jury, there's almost nothing more convincing than a live human being who takes the stand, points the finger at the defendant, and says, that's the one. But there was ample opportunity for effective cross-examination in this particular situation, at least. I mean, there were witnesses who went from saying, well, I'm kind of 70% sure to I'm absolutely sure. And that's the stuff of traditional cross-examination, isn't it? It is the stuff of traditional cross-examination. Isn't that effective? It may be even more effective than something quite abstract where somebody, you know, that seems to me to be a wonderful potential argument for reasonable doubt, to say, well, here's somebody who somehow got more sure over time, and that's ridiculous. I think that's what... Why is it an abuse of discretion, which is our standard? Right. I think that that's long been what courts have held to. They've used cross-examination, jury instructions, and argument as the safeguards for eyewitness misidentification. The problem... That makes a lot of sense, depending on lighting conditions and depending on all of the other variables, right? But how do you get in the fact? I'll say fact, because that's what some science reveals, that there are Dalbert-compliant studies showing that a witness's certainty doesn't necessarily correlate with accuracy. How do you get that in by cross-examining a lay witness? You actually can. And actually, some of the cases have pointed this out. Forensic, Brownlee is a case from, I think it's 2006, pointed out that cross-examination fails because the witness becomes committed to their identification by the time they're testifying in trial. So could I ask a different question? Sure. I'm trying to figure out what you couldn't get in by doing the kind of cross-examination that Judge Graves just explained. I see. Because typically, that works just fine. So I don't know how you get in through a lay witness that their certainty doesn't necessarily correlate to accuracy. And it seems to me that there's at least one other point that would be very tough to elicit. And I just want to know if there are others. But your briefing makes the point several times that witnesses are only accurate about 70% of the time, picking out somebody they haven't ever seen before, a stranger. And I don't know how you get that. That seems to fall into the same category. But is there anything else? Well, there's a lot of things, actually, that this expert would have helped the jury understand so that they could make the proper fact-finding analysis. What are those things? So one is obviously the confidence. This doesn't always equal accuracy. Also, confidence is malleable. It can change over time. And that's something that's counterintuitive. If it changes over time, then that seems to fall into Judge Graber's camp. If it changes over time, that seems to be very easy to point that out to a lay jury. But it typically tends to get better over time, and that's the problem. That's suspicious. Isn't that suspicious to a lay jury? At the time, when things were fresh in your mind, you weren't sure, and now suddenly, voila, you're sure. Have you been talking to the prosecutor? I mean, that seems to me to be ordinarily very effective cross-examination territory. So were there witnesses here who ñ there are witnesses, some who did change over time and became more certain. Are there any that did not? No. And one of the things, though, about the confidence ñ Oh, no, they all became more accurate. Are you telling me all became more accurate? No, they didn't all become more accurate. Or more confident. No one became less confident. Let's put it that way. My question's different, and you said no, and I think the answer is yes. But I'm confusing you. Are there witnesses who just said what they said and didn't move, that they were certain, that they were sure, and didn't move off that number, off that opinion? Yes, but there are issues with their identification that the expert could have helped the jury understand so that they could make the proper analysis about, you know, the accuracy of that identification. I don't understand why your answer is yes, but. It seems to be yes, and. And the problem is, if I'm understanding your argument correctly, if somebody comes in and says, this is what I saw, I'm picking out this person, it doesn't change. It doesn't get more certain. If it gets more certain, then that's easier to cross-examine. Correct. But if they just identify somebody and stay on that opinion, hold fast to it, I think your expert would have said there's about 70 percent of the time that won't be accurate. Is that right? That's right. And also, she would have talked about the ways in which confirmation conversation commitment can change that. Also, she would have, aside from the confidence issue, which is only one of the issues, she also would have talked about the lineup procedures, the ways in which those can influence, unwittingly, you know, completely honestly on the part of the police, but could unwittingly influence an identification. That's also fairly good cross-examination material, even without the expert. Well, the problem, though, is that what the studies show and what the Innocence Project shows is that what we think is good cross-examination and what is, you know, intuitive to us and common sense has been disproved by science and actually has been disproved by this Innocence Project. So that's what the expert was going to testify about. She wasn't going to just reiterate the same things that, you know, that you were talking about in terms of cross-examination. She was going to go into the things that the studies surprisingly showed. I mean, the studies have been uncovering these factors to their own surprise. So, again, counsel, what are they? You've given us two, and we keep interrupting you. You've given us two. One is 70% accuracy. Accuracy doesn't correlate to certainty, necessarily. Are there other? Yeah, so most jurors think it's just as easy to identify a stranger as a non-stranger. The studies don't show that. They think that when a weapon is present, your memory is actually even more accurate because it's a stressful situation and a weapon is present, so you're definitely going to remember the phase. But the studies show the opposite is true. You actually are not as accurate. Memory fades more or less a lot at the beginning and then the remainder fades over time. That's also counterintuitive. It's not common sense to think that. Most of us think that your memory fades later in time, but the studies show. You know what it boils down to is that a lot of the studies that have come out about eyewitness, and they've been coming out over a period of, you know, four decades at this point. It's been an explosion. A long time, but now there's more. Your argument would suggest that you should always admit an eyewitness identification expert because of these hazards. Only in instances where there's no independent corroborating evidence for the identification. My argument is very narrow. If there is an independent corroborating evidence such as someone who knows the witness, fingerprints, DNA, a co-conspirator who testifies, yeah, we robbed the bank. It's only where there's no connection. My contention is in this case for Guevara, for the counts 25 through 30, there was not. And I see I'm out of time. If there are any other questions, I'm happy to address them. I think not. Thank you very much. Thank you. May it please the Court. I'm Karen Landau, and I'll be addressing the final two issues. I'm counsel for Guillermo Herrera. I'd just like to address Judge Christen's point on the last issue on the expert testimony. You asked what cross-examination doesn't bring out, and there's a number of factors. One that was not mentioned is the presence of other things. For example, some of the eyewitness studies show that identification from a profile view is less accurate from a frontal face view. That was present in the case of Mr. Herrera's identification. Also the presence of headwear. Those are things that can be cross-examined about the fact, but cross-examination can't show that there's a difference between the accuracy of a frontal view versus a profile view. Also the stress factor, which Ms. Moore mentioned. Yes. All right. Thank you. The other thing I would just like to point out on that is that the problem and the limitation of cross-examination is it's fundamentally partisan in nature. It is evidence, and jury listened to it, but it is fundamentally partisan just like argument is. Expert witnesses are viewed often by juries and others as being partisan as well because that's what makes for dueling experts. Yes, it may be. That can be too, but the fact is, at least in a situation like this, there's really, aside from cross-examination, there's nothing that will serve to dispel commonly held myths about the accuracy of identification. I think an expert can do that. But that's why we talk about the gatekeeping function. We know that juries take expert testimony very seriously. Why was the judge's Dalbert ruling incorrect? I think the judge exercised his discretion in exactly the wrong way. First of all, I think, honestly, the judge just didn't want to hear it. The judge disregarded all of the evidence that bears on the importance of such testimony in a situation like this and then just said it's going to be too complicated, it's going to be too much of a pain, I'm not going to let it in. In fact, what the judge has done is, I mean, the evidence, why did the judge abuse his discretion? Of course, to go there, then we have to go into harmless error. Why was it not harmless? That is addressed in our brief. But I think in this case, the judge- Well, you first have to find error before you go to harmlessness. So if it wasn't an abuse of discretion, we never get to harmlessness. Well, that's true. And it was an abuse of discretion because the judge excluded critical defense evidence. There was nothing to replace it. That's the crux of an abuse of discretion. The judge had a long Dalbert hearing. The expert was not found to be, you know, she wasn't- Well, there's two experts. We're just- We're only talking about- No, we're not talking about Dr. Frazier. We're only talking about Dr. Davis. Dr. Davis gave reasonable testimony that was supported by the scientific evidence. She testified- She wasn't going to try to make a prediction that would be speculative as to the accuracy of the identification. She would have testified as to the factors that bore on witness accuracy. Should both Herrera and Guevara be allowed to- They're both appealing, and this was only an expert call by one of them. Yes, but Herrera also offered an expert. The expert would have helped him just as much, and the issue was fully litigated. And he did actually join in some of the briefing in support of Dr. Davis being allowed to testify. So, yes, he should be allowed. I'd like to turn- Since I'm really supposed to address these two other issues, I'll turn to that. I'm going to address the issues about the admission of the poem and then also the 924C. So, the rap poem. 13,000 more for a reason why. Murder, killer, murder, 13 stabs, make it rain blood. More make them choke till they die. This is not Shakespeare, but it is a poem that is replete with obscenities and murderous promise. Can I ask a specific question about it? Yes. It's a vile poem. I can appreciate your 403 argument, to be sure, but is there anything in the poem or in the expert testimony that came in to translate it that tells us that this necessarily refers to MS-13? Gosh, I'd have to look at the poem again, but certainly the government argued that it was MS-13. I mean, that was the government's argument. That's actually why it should have come in. Let me tell you, because your time's ticking, here's my problem with it. Yes, yes. So, this, of course, we know where it was found. We know who it was in her purse, Hernandez's purse and whatnot. My understanding is that she was affiliated. She was in a different gang that was affiliated. So, how do we know? I'm concerned that the jury may have been left without an oar here about whether or not this is describing or reminiscing about another individual entirely or activity by a different gang, not this gang. How do we know this referred to MS-13 at all? Well, we don't. We don't know that it did refer to MS-13, but it was admitted against the defendants, and I think that's the problem. Right, but if the jury knew that Hernandez was in a different gang, they had heard testimony about the tattoo on the back of her neck and whatnot and knew that she was in a different gang. So, I'm not sure why the jury would have necessarily drawn any conclusions from this poem. Well, I think that, first of all, the way it was read to the jury by the law enforcement officer was clearly directed as to MS-13. He testified about MS-13. And, you know, that was the reason it was presented. If there's no – and here's the problem. If it's not adopted by the defendants and it's not written by MS-13 and it's not maybe even about MS-13, it's clearly character evidence, because who's on trial? The defendants are on trial. She's not on trial. And the judge said, at least one of the judge's theories, is that Hernandez was clearly a member of MS-13. He said that, and actually it's not even clear that they admitted women members. But he said that outside the presence of the jury, I believe. He said that outside the presence of the jury. But that's one of his theories for admission, correct? Yes, he had several. But the problem is, too, he refused a limiting instruction. You know, he didn't. I mean, they asked for a limiting instruction, and he said no. He said, I'm going to let it in as to everybody. And it comes in. But that's a difficulty, because even on 401 grounds, he talks about this being a manifesto for MS-13. I don't even know if it's that. Well, but the fact is that's how it was presented. So I think, actually, that increases the prejudice. I think that increases the prejudice. I think you're telling me to move on. No, I'm sorry. Not at all. I'm troubled myself, and your argument's helpful. I'm just trying to probe and figure out how this rolled out. I think that, you know, look, I'm not a trial lawyer. I was not there. I was informed by trial counsel that it sucked the air out of the room. You know, and that's the problem with pieces of evidence like this, is essentially it's negative character evidence against a group of people. Well, if I could ask you sort of a follow-on to Judge Kristen's question. I have to put poem in air quotes. Of course. It uses the number 13 repeatedly. 113, 13,013 appears there, I think, five times if I counted correctly. Does that tie it to MS-13, at least in logic, so that it could be considered a manifesto of MS-13? Well, the problem is that many gangs, all serrano gangs that I know of, use the number 13. There's a million gangs in Southern California that use the number. I've represented members of many of them, so not necessarily. And, in fact, it's my understanding that she was a member of another serrano group. Right, but she's his girlfriend. The jury knew that. They knew that. So I'm concerned about the prejudice vis-a-vis Guevara, because they knew where the poem was found, and they knew that she was his girlfriend, and then she knew that the jury was told she was in a gang affiliated with MS-13. Right. And she was the identification, certainly from the Reynoso and the bus stop victims of the stabbings on December 26th, gave pretty solid descriptions of her, right, and much less reliable, it seems to me, much less specific of the person now identified and convicted as Guevara. So it links him to that scene. And whether she was there with somebody from her other gang, whether she was there with somebody entirely different, that's what we don't know. But it seems to me, as to Guevara, this is no small thing. No, I don't think it is a small thing at all. But I would add that it's very prejudicial against Mr Guevara because he was most closely linked to her. But it was prejudicial against everybody. Wouldn't that be true even without this so-called poem? In other words, the identification of her, regardless of your expert, was pretty solid because of her weird eyebrows and so on. And he was the boyfriend. So isn't that the real linkage rather than this sort of odd rambling thing? I think the point is, I mean, Your Honor, I'm not Mr Guevara's attorney, so I'm sure that counsel will be handing me a note to respond to your question specifically. But what I can say is that the identification may come in. I don't think it's just a question. I think this evidence clearly harmed all of the defendants because it was sort of, you know, I mean, the government's theory all along was these were really violent bad guys. Right, and there was evidence of them being violent bad guys. Totally apart from this writing, there were murders, there were assaults. There is a lot less evidence against some of the defendants, including Flores and Carcamo. There was a lot less evidence against them. So, I mean, I think that the Court is going to have to parse that out. I would like to, or maybe I should just ask the Court, if you have questions about what you would like me to address on the 924C issue. I was just going to say it may be that another panel has priority on this issue. That is correct. I think probably, from my perspective, I find it more helpful to have the specifics of this trial addressed. But, of course, if my colleagues disagree. I agree. It's true, another panel, the Beguy case has priority, but the Court asked about it. So, I wanted to. If there are no further questions, I'll reserve the rest of the time for rebuttal. You may do that. Good morning, Your Honors. May it please the Court, Sonia Ralston for the United States. I'm going to address the cell site expert, and I was also going to address 924C, but it appears the panel is not so interested in that anymore. We're interested, but we'll just wait and find out the answer. Fair enough. Okay, so I wanted to start on the cell site expert issue to answer some of Judge Christin's questions about the record. The Metro PCS employee who testified during the case in chief, the pages are at 3076-92. I have them. Okay, and the exhibit numbers you asked for are 1011, 998, 997, 996, and 994. Oh, wait, you think you just gave me one I don't have. Sorry. So, it's the cell site records for five defendants. 1011, 998, 997, 996, and 994. Okay, I'll double check. Thank you. Okay. And his testimony, before he gets into the actual records, he talks about how the cell phones work, how they're set up, how to read the records. And at pages of the defendant's joint excerpts 3073-74 and 3086-87, he explains that the towers, you know, what a switch is, what the sectors of the towers are, how you read the records to get the minus one to divide them up, how to read the azimuth degrees to adjust, you know, how they're directional and how they're pointed. So, he gives quite a bit of information about how to interpret the records. And I read that, and that would have been really tough for a lay jury to interpret. I read that testimony, right? And so, and isn't it, is there anything wrong with what the opposing counsel said about what came in in the case in chief, what the jury would have had, that they knew everybody's cell phone numbers. They had some testimony that these folks shared cell phones, but be that as it may, they had the cell phone numbers, and they had indications of which phones pinged off which towers on which dates in advance of the minute. And then they had this instruction that the judge said he was only going to allow radio range. And I think in the government's case in chief, then the jury didn't know at that point what radio range meant. Is that right? That's correct. Okay. So, is there anything that you disagree with about what opposing counsel said about what came in in your case in chief? So, I think two things. One is that the business about the directionality of the towers and how they're divided into sectors, I think does give more information about how, you know, sending the signal not just kind of generally, but in a specific direction. And then you have where before that witness testifies in this discussion about what's going to be allowed, the court says both that the jury can make its own map and if they want a map of the city, we'll send back a map. That's at 3045. And then also that the maps, although the government had prepared a map that plotted out the cell phone towers and wanted to introduce it that day, the court had originally said that was okay and then changed its mind. But said, you can do this in closing argument. This is just a representation of the data. You can do this in argument. And so, that's important because it's not necessarily that the witness had, you know, gone over it in his direct, but it's that the evidence was in the record and this is fair argument. And that was on notice. So, I think that like before the government arrested its case in chief, everybody knew that at closing argument, we were going to stand up with these maps and say. Well, at least they knew you could. Yes, that's right. And so, when I looked at the closing argument, there's an argument by the government that Guevara's cell phone was, quote, within blocks of the attack, close quote. And that strikes not within radio range. Yes, but if I could put that in context. Okay. If you read the three sentences and this is at 3323. Yes, I've got it. So, he says, he's talking about it pings off this tower and then 20 minutes later it's off this other tower and then it's over here and that's before. And then he gets this and he says, and what can you infer from this? You can infer that the cell phone was within blocks of those attacks when they happened. And there's no objection to that statement. Before he even goes through this map, he says, and this is at 3321, that quote, this is not part of the cell site witness. So, he's saying and the district court also gives an instruction that these maps are not evidence, they're just illustrations. So, there's no claim during this part of the closing argument that this, that he's arguing based on what Agent Skavran said. His argument is admittedly not part of the cell site witness. And he's saying you can infer from looking at the towers that it was within blocks. Now, it's possible that that was an improper argument in light of the radio range, but there was no objection that hasn't been raised in their brief. It's at this point waived as we pointed out in our brief. My question is whether or not you're defending it as proper or whether you're saying that it was a mistake and there wasn't an objection. Is the government in the sense that this was a proper argument? I think it's a close call in light of the radio range idea. I do think that there's a common sense understanding that when you look at the map of the cell towers and you see how closely together they are located, you know, they're not a cell tower and then 50 miles away there's another tower and 50 miles away there's another one. They are located about a mile apart on the map. And I think it's a fair inference from that that the company puts them so closely together because you're going to connect to the one that's closest to you and as you move, you're going to move your connection to the next tower and the next tower and the next tower. And, you know, it's not rocket science. When you look at those maps, there's no reason the company is going to spend all this money to put those towers so close together if the radio range really carries so far. And he's saying, what can you infer? He's not saying you heard evidence that this is within a couple blocks. He's saying you can make an inference. And so I think that is a fair inference from common sense. You know, people understand from their cell phones that, you know, obstructions can get in the way. You have to be pretty close. You might have to go outside to get a signal if you're and, you know, also the idea about radios that people understand the further you get away from the signal, the weaker it gets. So if you've ever driven in a car and lost the signal and then picked up a new station, you understand that the signal only reaches so far. And so we put together that common sense experience with the fact that the towers are located so closely together. I think it is a proper argument. Even if it's not, I think any argument that it's improper argument has been waived. And even if all that is true, especially I think it's harmless, as Sinister Guevara particularly, that you have all of these identifications by the victims of him and his girlfriend that they were the attackers. Identifications of him aren't great. But having the jury understand that his cell phone was very close to Hernandez's cell phone and where those phones were pinging would have been very significant. And the fact that the two phones were close to each other is not something that you need the expert testimony to understand. You look at the records and the records show the identical pings to the identical towers at the same time. So that's something that was fair from the case in chief and not something that you needed expert testimony. And again, you know, I think this is important that the prosecutor said that this is not part of the cell site witness. He wasn't trying to use agent's governance testimony against Mr. Guevara. And, you know, I think that if he made a slip of the tongue to say within blocks, whereas other times he was very careful, I think, to say that it's pinging off a tower that is located within blocks of the incident. He was. Yes. And so if he slipped in this one little place and the defendants didn't object, didn't draw to the court's attention, whereas there are other places, you know, this closing argument was not like a 20-minute thing that then just stopped. It went on for quite some time and there were breaks. And during those breaks there were times where the defendants came to the court and said, you know, I think he made a factual error about a date and maybe that should be corrected. I didn't want to interrupt it when it happened. And then he said, yes, you're right, I'm sorry, I'll correct it. And he did. So that, you know, there was an opportunity, I think, to bring it to the court's attention if there had been a problem and they didn't and to, you know, throw out this five-month trial on the basis of one slip would be, I think, improper. And that says to Mr. Guevara, you know, the evidence wasn't admitted against him as to the defendants Herrera and Lopez against whom it was admitted. I think it was proper rebuttal that they put their identity at issue and the cell site evidence helps corroborate that they were the perpetrators of these crimes. So it does rejoin their defenses. Again, this is a matter within the wide discretion of the district court, as this court said in Armstrong. And there's no reason to think the district court abused its discretion. As to whether a limiting instruction, there was no request for a limiting instruction against the three defendants against whom agent's governance testimony was not admitted. If you look at Joint Excerpt 163, which is where they pointed out that there was a discussion with Cruz Ramirez's counsel, the court says, I ruled for you. You know, what are you complaining about? And the next sentence out of his mouth is not, but we want a limiting instruction. He goes on to complain about you shouldn't permit this testimony at all. And the court comes back and says, you know, really, you want to reopen this? Fine. Like, I'll reopen it and you'll lose. So they didn't, you know, they had a chance. It wasn't futile. They could have asked and they didn't. And that's within counsel's strategic discretion about whether they want to ask for a limiting instruction or not. And I would also point out that Mr. Guevara, even though the testimony wasn't admitted against him, the court did permit him to cross-examine agent Skaverin. And so that was his choice to go in and do that. And then there was one point about this, talking about this site at page 81 on our brief about it's within a mile in an urban area. This is background that we were providing about how the science works. And that's actually a citation to the Daubert hearing. So that wasn't testimony that was in front of the jury. That's just background. I'm happy to answer any further questions you have about this issue or 924C. I have a 924C question since you're here. There are some of these, there's the Boyd for Vagueness argument, but there's also seems to be a mistake that the government's conceding about a lesser included 924C, 924F. And that 924 issue, I think, applies to, well, I have a list here, but maybe we could just run through it and make sure that we're on the same page about that. That's a Cruz-Ramirez issue. Yeah. So it applies to counts 8 and 15. Right. 15 is Cruz-Ramirez and Herrera. Right. It doesn't apply to Lopez, I don't think. Count 8 is Mr. Lopez. Wait, let me look back. So it applies to those three defendants. Yes. Okay. So it's count 8 for Mr. Lopez and count 15 for Cruz-Ramirez and Herrera. And those are instances where there was a 924C and a 924J for a murder. Right. I have my notes. By defendant. It's a little hard to keep them all straight. But as to those, the lesser, it seems to me the particularly lesser included that should have merged, and is the government conceding that was just an error? Yes. Okay. Thank you. Okay. And if there's nothing else, I'll save the balance of my time for my colleague. Thank you. You may do that. May it please the court, Sangeeta Rao on behalf of the United States. I'm going to address the eyewitness expert, then the search of the Lopez cell phone. Excuse me. Is that too much time? Oh, 24 plus the 3. I'm sorry. Continue. I plan to address the eyewitness expert, then the search of the Lopez  Turning to the exclusion of the eyewitness expert, I'm going to address the eyewitness expert. The district court did not err plainly or otherwise in excluding the expert. This court has recognized that a district court has a great deal of discretion in making a rule 403 determination to exclude eyewitness expert testimony. And in fact, we are unaware of any case in which this court has reversed such a ruling. Because the district court's thorough consideration of the issue and the first time that this court gives it different treatment. There's a lot of other fact patterns that I think are distinguishable in the case file that are discussed in the briefing. And a lot of those cases were cases where there was ample room for cross-examining the witnesses. And they sort of fall into a different category in the way that Judge Graber was describing. And I'm interested in this case. There are a couple defendants for whom the eyewitness, trying to rattle eyewitness testimony, shaky eyewitness testimony was very pivotal. It strikes me that that's true of Herrera and Guevara in particular. So I'm trying to figure out how the science, what I'm calling these facts that they want to get in could have been elicited from lay testimony. I mean, you heard me. I had the same question for you that I had for opposing counsel. So I think that Your Honor was most concerned with the competency accuracy correlation and the 70% number. Well, those are two of my concerns. And the record here gave the jury, gave the defendants the tools to make the argument that there's no correlation between or limited correlation between witness confidence and the accuracy of identification. How would the jury know that some studies have shown that witnesses only get it right about 70% of the time? How do you get that in? Yes, that very particular fact, Your Honor, that expert studies show, wouldn't have. But something very close to that was available from the record. Okay. What was that? So that's the fact that a confident witness can make a misidentification. And there were several examples of that in the record. Ora Galdamez, who was the wife of Hugo L. Galdamez, who were the two people who witnessed the Strata shooting. She identified somebody who was in jail at the time. Yes. And the jury heard that. And she said it was with a confidence of 9 out of 10. Okay. That's a confident witness making a misidentification. Also, Hugo and Ora Galdamez together, the husband and wife team, stated that the driver of the getaway van was a woman, even though the government's evidence was that it was Cruz Ramirez, a defendant in this case. The defense counsel took that and argued in closing that the government is telling you that these witnesses are 100% confident that the getaway driver was a woman, even though the government's theory is 100% confident that it was somebody else. And there was more. Sen Ong, who was one of the witnesses in the Ng's Joldik murders, he made a misidentification also. After saying he would never forget the shooter's face, he identified someone else who had an alibi for that night. So unlike other cases, in this case, there was a record from which the defense counsel could argue a confidence. And did argue. And did, as I explained, for example, with the getaway driver analogy. That record gave the defendant the tools to make their point about the lack of correlation between confidence and accuracy through cross-examination argument. Judge Christin, you mentioned the point about the 70%. Admittedly, that exact number and the fact that it comes from expert studies wasn't admitted. But that's not really the question for this court. The question for this court is whether the district court abused its discretion in believing that that little bit of extra information about the 70% in experts, 70% in scientific studies, would be so valuable that it would outweigh the prejudicial effect of the expert, which the district court found. What is the prejudicial effect of the expert? Right. So the district court said that it was going to make a Rule 403 determination during trial. And it found that it would waste time, confuse the issue. It would be an hour, as I understood it. Well, no, Your Honor. And the proof of that is when you look, when the district court said in the middle of the trial, I'm keeping a list with Dr. Davis on one side and I'm making a very careful list of whether this would be relevant and make the 403 determination. And then there was some testimony from Inspector Lau about the line of procedures. And the district court said, hey, actually, I think maybe there might be room for some expert testimony here. Please give me a limited proffer on expert testimony on this issue. What the defendant did, what Guevara did, because Ferreira was not in the picture at this point. He was not making 403 arguments about this expert. They submitted a 43-page single-spaced submission from the expert, along with over 1,000 pages of supporting evidence. But, counsel, what prevents the judge from saying, I'm giving you an hour? I'm going to limit the amount of time. Well, the district court asked for a limited proffer. So the defendant said, this is what it would take. This is what it would take to make this point. It is very troubling to me, since you raised the question about the six-pack lineups and the procedures. There's a witness on the stand by the government who, the cause of the judge to caution the government. You're getting really close to opening the door, he said. Because the witness said he's something to the effect of the fairest possible lineup procedure, and he said it twice. And on cross-examination, defense counsel tried to cross-examine him about that, and the government objected that this witness wasn't qualified as an expert to go into that. And the court sustained the objection. Your Honor, that's not our read of the record. That's absolutely what happened. I've got it here, counsel. At 414 to 420, the supplemental excerpts of record, the district court allowed full cross-examination of this issue. When the defendants say that they were cut off on cross-examination, they're citing Guevara's excerpts of record 1269 to 70. On those two pages, that's when the defendant was trying to cross-examine and speculate on general factors affecting eyewitness reliability. Not about the lineup procedure, but about general factors. And the district court said, no, you can't cross-examine on general factors. I have those pages right here. 1269 to 70. Right. And so I'm familiar with what happened. I don't want to take up a lot of your time, but let's go back up. The transcript will speak for itself. But it goes back to, I think, Judge McKeown's question and my question. On the one hand, if you're concerned about 403 taking too much time, it's easy to limit the amount of time given to the defendants to introduce this expert testimony. I'm struggling with why it would have been prejudicial. Well, one thing to realize, Your Honor, is that the defendants didn't ask for that. After the district court asked for a limited proffer, the defendants made this voluminous proffer with 43 single-spaced pages and 1,000 exhibits, and the court said, that is voluminous. This is out. The defendants did not come back and say, Your Honor, please just give us an hour. It wasn't up to the court at that point, sua sponte, to decide that a limited amount of time would suffice. Also, the fact that the defendants submitted this huge 1,000 pages of exhibits means that the government would have presumably had a lot to cross-examine on because they were saying that the proffer was based on all of these exhibits. The government also might have then needed its own expert witness. So the district court, in this very large trial, could have decided, in an exercise of its discretion, that there was enough in the record for the defendant to make the arguments that they wanted. For example, because of the misidentifications, they were definitely able to argue that confident witnesses do not necessarily correlate with certainty or reliability of identification, but the district court could validly believe that the jury had the tools to evaluate the reliability of identification. How would they have evaluated the reliability or the suggestibility of the six packs? What did they have? They had that Inspector Lauer testified that a lineup would be suggestive if it included only one individual with a unique feature. That's at Supplemental Excerpts Record 414 to 420. The district court also reasonably concluded that that principle was within the common sense of jurors. Also, a number of individuals in the lineup actually had facial blemishes, not just Guevara. Inspector Lauer testified to that. The court found that at Supplemental Excerpts Record 2189. This court can view the six packs. They're at Joint Excerpts of Records 3786, 3792, and 3796. Right here. I have them right here. And my question about the six – so I'm looking at the moment at the Herrera profile. The six pack of – these are in profile. And my question is, there was testimony that these six packs were prepared in the fairest possible way. So my question is, how would the defense have cross-examined that statement? So, Your Honor, for Herrera, Herrera was not making an objection to the lineup or making a request for Dr. Davis's testimony about the lineup. That just wasn't before the district court. The district court didn't have a chance to evaluate and make a 403 case-specific determination about Herrera because Herrera had, as this court knows, proffered a completely different expert, Dr. Frazier. And when Dr. Frazier was excluded, never then joined in any of the filings or arguments being made by Guevara mid-trial for – That's not what your opposing counsel said. I'm not sure that's what the record shows. I think that he did join some of them. Not mid-trial, Your Honor. After Dr. Frazier, the first expert, his expert, was excluded, he didn't join in anything else. What he joined in was something pre-trial, before his own expert was disqualified. But if you look at the record – How does that change anything? If he's either joined or he hasn't joined? If he joins earlier, that seems to make the argument stronger. I think I'm missing your point. So – He joined? He did not join the proffer about Dr. Davis testifying about lineup procedures. He did not – there was no rule 403 determination made during trial that Dr. Davis' testimony about lineups was relevant to him because he never said that I need a rule 403 determination made about – with respect to expert testimony about me. The district court excluded his witness under 702 prior to trial. Well, that's not challenged. I think it's clear that's not challenged. Right, but he never then let the district court know that he needed a rule 403 determination for himself in the midst of trial. It's specific to what is going on in trial. That's why the district court had a piece of paper with Dr. Davis listed at the top. He was making a rule 403 determination about Guevara, not about Herrera. On Guevara then, at that point is when he says it's confusing and voluminous or too lengthy. Yes. And I take it your point is then the action should have shifted to the defense to either say we can impact this or we can change it or make some other argument. If this court believes that a more limited testimony would – was necessary, then yes. It was up to the defendants to ask for it. But ultimately this court needs to decide whether the district court abused its discretion in deciding that all of the factors before the jury gave it the tools to evaluate the eyewitness testimony compared to whatever marginal probative value an expert could add. And the district court did not make an abuse of discretion. When you make that ruling, the ultimate 403 ruling, what role should he have given, how much weight should he have given as to those two witnesses, Guevara and Herrera, that this is very central to their defense. There wasn't a lot of other cooperating evidence. Well, Your Honor, I think that certainly some, and in cases courts have considered the significance of eyewitness identification, but here there actually was a lot of other evidence. This is not a single eyewitness identification case. For Guevara, there was multiple identifications, not just of Guevara but Hernandez, and those powerfully reinforced each other. And that gets back to the poem. That gets back to the poem in itself by linking Guevara to her, because I think that the government had a much stronger case that she was present. I think you've answered my question. Turning to the poem, if Your Honors would like to turn to that, the district court did not abuse its broad discretion under Rule 403 in admitting the rap poem either for three principal reasons. Hernandez was Guevara's girlfriend and an unindicted co-conspirator in this case. The district court so found joint excerpts of Record 1452. But he didn't rely on her co-conspirator status. He said this isn't hearsay. He's not offered to prove the truth. He said that too, Your Honor. He said that it wasn't offered to prove the truth, that there are, in truth, 113 ways to kill a buster. Doesn't it come really quickly? Doesn't it button down to a 403 analysis? It is a 403, yes, a 403 analysis. But the district court did find that she is a co-conspirator, and that's important because her actions, just like the other defendants' actions in this case, were then important to show the conspiracy and their involvement. She was referenced in the indictment in Overt Acts 74 and 75 as the juvenile accomplice who helped Guevara with the brutal stabbing of the three victims on December 26th, and she was the actual stabber of the female victim, Milagro Moraga. It was important to show Hernandez's identity as one of the participants in the December 26th stabbing, which then powerfully reinforced the conclusion that Guevara was the other participant. Guevara was charged with aiding and abetting Hernandez's stabbing of the female victim, Moraga, so it was important to establish her intent and that she was motivated by a purpose to promote the gang. This evidence was admissible against all the defendants, not just Guevara, because she was an unindicted co-conspirator and she was closely affiliated with MS-13. Women are not members of MS-13. The government keeps saying that, but was there any evidence of that? That women aren't members of MS-13? I can't find that evidence anywhere. So, Your Honor, I have to say that I know the Franco case more for the record. That trial. Yes, I know, so I'm afraid I can't say from the record. Okay, but the judge thought that she was a member of MS-13 and he said that very clearly into the record. Now, the jury wasn't present, but should we be concerned that that was part of what he was thinking at the time he made the poem ruling? I don't think it's relevant whether she was a formal member of MS-13 or whether she was MS-13 affiliate. It's really the same. She very much identified herself as MS-13. Well, it matters, I think, counsel, because at one point he decides that she's a member or at least said that into the microphone, right? And then, although you opened with talking about unindicted co-conspirators, the judge winds up circling back and saying that's fake and false and I'm not relying on that. He uses those words and he said I'm relying on this isn't hearsay. It's not offered to prove the truth of the matter asserted. So, it gets a little bit wobbly there and I'm just looking for your help to try to decipher that. So, to the extent that it's wobbly, I think that this court can still affirm based on any ground supported by the record and it is supported by the record that she was an unindicted co-conspirator in this case. Her personal belongings when they executed the search warrant were filled with things about I love MS and MS insignia and the devil's horns. She had a green composition book that had the phone numbers of many of the gang members. Excuse me, did the jury hear that evidence? Yes. Thank you. This was all admitted in the same location in the record where the rap poem is discussed. That green composition book had references to Soldado, who was Cruz Ramirez, Spooky, who was Defendant Lopez, Triste, who was Velazquez, who you're going to hear about in a later case today, showing her connections beyond Guevara and showing her intimate connections with MS-13. It was not more prejudicial than probative under the Rule 403 balancing test because on the one hand, it was very probative because there was a tight connection between the poem and the conduct. The poem was not just about violence in general or about a general fascination with guns, for example. It was about violence against a specific type of victim, Nortenos, the sworn enemy of MS-13. The depth of her adoption of MS-13 rules helped explain a fairly senseless crime where people were just attacked on the street so the jury could understand that and understand the motivation behind it. It was not unfairly prejudicial because there was already a lot of violence and extreme violence in this case. There were multiple murders, multiple violent assaults, and a great deal of talk among the various gang members about wanting to kill and hurt and stab Nortenos. Guevara, for example, said that he liked knives because he liked how they felt going through the body. This was just of a piece of the other kinds of evidence that was admitted. So on a 403 analysis, the district court did not err. Under harmless error, even if there was any error in the admission, it was harmless. This was one small piece of evidence. As we just said, there was a plethora of other evidence, and it's important to see what the government did with it in closing argument. After it was read to the jury, the poem was not brought up again until closing argument, and then it was discussed very briefly in a non-inflammatory way, not rehashing any of the specific language other than referring just to the first sentence. The prosecutor referenced that first line and called it a peculiar writing and tied it into the identification of Guevara as the stabber, saying what are the odds that people would have misidentified Guevara and his girlfriend, his girlfriend who has, quote, fantasies about waging war with perceived Nortenos. That's a joint excerpt of Record 3386A. Under that analysis, it just wasn't prejudicial or harmful. Turning to the Lopez search of the cell phone, this claim involves a narrow category of evidence. It's just 12 photos from Lopez's phone showing him with gang tattoos and flashing gang signs. In response to the court's questions about what the effect of this evidence was on the trial, it was certainly harmless. Six cooperating witnesses testified that Lopez was in MS-13, PAMA, Abraham Martinez, Alvarado, Espinol, Burrito, and Murata. Their specific testimony is referenced at Government Brief 272. Beyond that, there was a mountain of evidence proving that Lopez murdered Ng and Joldik on March 29th in retaliation for MS-13 member Tuesday being shot, and that included his admissions about committing that crime and the fact that the murder weapon, he was actually found with a murder weapon, and that was the murder weapon that he was trying to stuff into a sewer grate. So the fact that 12 photos were admitted certainly couldn't have changed the jury's outcome in this case. But going to the merits, there was no Fourth Amendment violation, warranting suppression related to those photos. The search of the phone was supported by a search warrant, so it's not a Riley issue. A neutral magistrate reviewed the search warrant affidavit, determined there was probable cause, and issued the warrant to search the phone. Despite the warrant, defendant made two arguments that his Fourth Amendment rights were violated, only one of which he raised below. In the district court, he argued that federal agents violated the Fourth Amendment simply by assisting the state officers in the technical task of unlocking the phone and imaging the data because the state officer was not present during that technical work. That is not a Fourth Amendment violation. The Fourth Amendment simply requires for the manner in which a search warrant is executed to be reasonable. We know that from the Supreme Court's Falea decision, this court's decision in United States v. Martinez-Garcia, both discussed in the government's brief. There's nothing unreasonable about federal agents assisting state officers. If we decide that the fruits of this search were not prejudicial, we don't have to reach that, right? Correct. Yes, Your Honor. Unless the court has any more questions on that issue, then we will rest on our brief. I don't believe we have further questions. Thank you. Okay, so a few points. First, I did want to – I think the government mentioned it, but the exhibit that Judge Christian was asking for in the context of the cell site information that came in in the case in Chief is 998. We apologize for the mistake. That's okay. I think I've got mine in cell state now. In fact, I've verified it. All right. The eyewitness expert – the government's argued that – well, let me turn to the standard of review and what an abuse of discretion is. Of course, I brought the wrong note. But when the court is evaluating the admissibility of evidence, the court is supposed to consider the probative value of the expert testimony in the proponent's favor. And that is not what happened here. The court did not consider the probative value. And in terms of – when we evaluate – I would just add that when we evaluate abuse of discretion, you know, this is about as strong a case as you can get in terms of when the evidence should have come in, it was relevant. In terms of the court's ruling that it was going to take too long, the government presented about 100 witnesses. The defense tried to present one. And, you know, it's just – and of course, if it's improper expert testimony or it's going to invade the province of the jury or it's going to violate other rules, the court would have been right to exclude it. But it wasn't any of those things. It concerned – it involved matters of concern to the validity of the identifications of two defendants. I would say, you know, in terms of cross-examination and that being a protection against misidentification, there are facts – even if the confidence-accuracy dichotomy was brought in via the cross-examination of Ora Galdamez, who did misidentify a defendant, identified someone who was in custody and clearly was not the shooter, we still have other factors. There's nothing – there was no – there's no way for the defense through cross-examination to bring out the fact that profile identifications are less accurate. There is no way to bring out that other factors affect identification. There would have also been some potential expert conclusions that were not helpful. For example, I think those studies also show that when people are members of the same racial or ethnic group, their identifications are much more accurate. And that was true in most, if not all, the identifications here. Not all, certainly, but many of them. That would be – yeah, that would be – that would be true, too. But that – I mean, that was not – nonetheless, we have to have – we have to have faith. The defense is supposed to defend the – our job is to defend the defendant. And, you know, the evidence was offered. It was proffered by the defense. The arguments were preserved. And the court is supposed to consider – it's supposed to take that evidence in favor of the proponent. Okay. I do want to add a couple things about – about Guevara, and just prejudice in terms of the Guevara ID. You know, one of the witnesses, you know, in terms of the Veronica and Guevara identification, one of the witnesses, Reynoso, actually said he saw two men. So there was – there's some real doubt there. And I am just about out of time. So lastly, I would just point out that in terms of the cell site evidence, admitting it in rebuttal was really an end around Rule 16. And there was a – there was substantial prejudice, particularly to Guevara. I would add that in terms of the cell tower, as Judge Christian pointed out, the jury was not going to map – was not going to take that information and map it out themselves. And all of the defendants lived in the neighborhood. So their phones could have been there regardless.  Thank you, counsel. Well, the case just argued is submitted. And we thank all counsel for very helpful and well-prepared arguments in this complicated set of cases. Yeah, I think it's always very difficult in these multi-defendant cases to create a cohesive argument. And I think that both – counsel on both sides have done an excellent job. Thank you.
judges: McKeown, Graber, Christen